**In re Solomon SMITH, Debtor.**

**Solomon SMITH, Plaintiff,**

**v.**

**FIRST SUBURBAN NATIONAL BANK, Defendant.**

Bankruptcy No. 93 B 03560.
Adversary No. 97 A 00622.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Aug. 31, 1998.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

Erica Crohn Minchella & Karen J. Porter, Minchella & Porter, Chicago, IL, for Plaintiff.

Laurie A. Silvestri, Chicago, IL, for Defendant.

### POST–TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case relates to the bankruptcy petition filed by Debtor–Plaintiff Solomon Smith under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. Debtor originally owned a home in Maywood, Illinois. Debtor defaulted on a loan with the First Suburban National Bank ("FSNB" or the "Bank"), filed for bankruptcy protection, lost the home in a foreclosure proceeding, and received a discharge in bankruptcy.

Debtor, along with his wife and daughter, later purchased a new home in Berkeley, Illinois, and obtained financing on the new home from the same bank. Debtor and the Bank negotiated to add Debtor's discharged debt to the current mortgage on the new home. Debtor was allowed to reopen the bankruptcy case to file this action alleging that the bank thereby violated the discharge injunction of 11 U.S.C. § 524. He seeks to invalidate his new promissory note as having

been solicited and accepted in violation of the discharge granted to him and the injunctive effects of Bankruptcy Code § 524(c) and (d). Following trial and based on evidence admitted and considered, the Court now makes and enters the following Findings of Fact and Conclusions of Law. Pursuant thereto, judgment will separately enter in favor of Plaintiff.

## FINDINGS OF FACT

1. Solomon Smith ("Smith," "Debtor," or "Plaintiff") filed a chapter 7 bankruptcy petition on February 7, 1993. On the petition date, Smith resided at 606 South 1st Avenue, Maywood, Illinois ("Maywood home").

2. Smith has a high school education and three to four years law enforcement training. He is the former chief of police for Maywood, Illinois.

3. Patricia Smith ("Patricia") is Plaintiff's wife. Patricia was not a party to the bankruptcy proceeding nor is she a plaintiff herein.

4. Tammy Smith ("Tammy") is Plaintiff's daughter. Tammy is not a plaintiff in this Adversary, nor was she a party to any bankruptcy proceeding.

5. Defendant FSNB has multiple branches in Illinois, including a Maywood branch, and was formerly known as First National Bank of Maywood. During the periods of time mentioned herein, Robert Franch ("Franch") was president of FSNB and Jeweline Davis ("Davis") was vice-president. Norma Fabela ("Fabela") was a bank employee. Davis and Fabela are still employed with FSNB.

6. The evidence showed that Debtor's relationship with the bank was primarily through Franch with whom Smith had developed a business relationship.

7. Smith testified that he had a thirty-five-year banking relationship with FSNB. He testified that he also had a banking relationship with LaSalle Bank.

8. On July 14, 1969, Debtor and Patricia borrowed $16,000 from the FSNB secured by a trust deed on the Maywood home. On April 14, 1976, Debtor and Patricia borrowed $5,000 from FSNB secured by a junior mortgage on the Maywood home. Neither of these obligations was ever fully repaid.

9. On January 12, 1982, Debtor and Patricia executed another mortgage on the Maywood home to secure a note to FSNB for $150,000. FSNB assigned the note to the Small Business Association ("SBA").

10. On September 23, 1991, Smith and Patricia borrowed $19,000 from FSNB at an 11% interest rate. The loan was secured by a trust deed on the Maywood home.

11. Smith filed for bankruptcy under Chapter 7 of the Bankruptcy Code on February 7, 1993. He did have counsel to aid him in the bankruptcy.

12. Prior to filing his bankruptcy petition, Debtor informed Franch of his intention to file bankruptcy and unsuccessfully attempted to negotiate a settlement with SBA.

13. At the time the bankruptcy case was filed, Debtor and Patricia were in default on the loans earlier described.

14. FSNB was listed as a creditor on Debtor's schedules and received notice of Debtor's filing. FSNB never sought to reaffirm any of its debts with Debtor, nor did it file any objection to discharge of any of those debts.

15. Soon after Smith's bankruptcy filing, he met with Franch and asked about the possibility of receiving a loan for a new home. On February 26, 1993, Debtor and Patricia signed a Uniform Residential Loan Application with FSNB for the purpose of purchasing a new home located at 5902 Park Avenue, Berkeley, Illinois ("Berkeley home"). Tammy signed a residential loan application on March 27, 1993. The loan application did not disclose that Debtor had filed bankruptcy.

16. Davis handled the paperwork for the $94,000 loan. Although Davis notified Franch that Debtor was in bankruptcy, Franch told Davis to process the loan. The bank's general policy is if the bank president approves a loan, the loan committee will approve the loan.

17. In March 1993, FSNB approved the loan to Debtor, Patricia, and Tammy in the principal amount of $94,000. The annual

percentage rate was 8.508 percent. The loan was payable in monthly installments of $790.90 with a balloon payment due on May 5, 1998.

18. On April 8, 1993, the Smiths closed on purchase of the Berkeley home. The closing took place at a title insurance company. The Smiths were represented by an attorney who attended the closing with Patricia and Tammy. Debtor did not attend the closing.

19. The documentation for the new loan was prepared by either Franch or Franch's secretary. All three of the Smiths signed the loan documentation. Solomon Smith signed the documentation prior to closing, while Tammy and Patricia signed the documentation at closing.

20. The Berkeley home was purchased in a Land Trust, FSNB Trust # 93-2101. FSNB was appointed trustee. Debtor, Patricia and Tammy are the sole beneficiaries of the Trust. Under terms of the Trust agreement, FSNB was designated land Trustee, authorized to act only at the written direction of Solomon Smith.

21. None of the Smiths signed a guarantee or other document personally guaranteeing the land trust debt. However, the Smiths were each signatories to the $94,000 promissory note.

22. A downpayment of approximately $24,000 was made via a cashier's check in Tammy Smith's name, but Tammy denied at trial that she made the downpayment. Tammy also denied that she had a bank account at FSNB, but she indicated on her loan application that she had a $10,000 account with the bank. Patricia testified that Debtor's aunt gave Debtor the money which was eventually used for the downpayment, and that this money was placed in Tammy's account.

23. Tammy testified that she wanted her name on the loan application because she wanted to establish and increase her credit. FSNB offered testimony that Tammy Smith was a signatory to the loan application because of Debtor's poor credit rating following the filing of his Chapter 7 petition.

24. On July 14, 1993, an order was entered allowing Debtor's bankruptcy discharge, and his case was closed effective August 13, 1993.

25. While debt based on the old $19,000 loan (Finding No. 10) was discharged as to Debtor, Patricia, who did not file in bankruptcy, remained liable for that debt. She testified at trial that she is currently unable to repay it.

26. On July 23, 1993, FSNB filed a mortgage foreclosure action against Debtor and Mrs. Smith for the pre-petition loans. SBA counterclaimed seeking a mortgage foreclosure in the same action.

27. On February 16, 1995, a judgment of foreclosure and sale was entered finding that SBA had priority over FSNB. FSNB's rights were not adjudicated with relation to the mortgages it held, nor was a personal deficiency judgment entered against Mrs. Smith[1].

28. On July 5, 1995, an Order approving sale of the Maywood home to the SBA for $35,000 was entered. This order did not provide for any kind of disbursement to FSNB.

29. Earlier, in the Spring of 1994, Debtor contacted Franch about the possibility of repaying the $19,000 loan from the Maywood home. Debtor testified that he wished to repay the obligation despite his discharge as an expression of appreciation and goodwill for his continuing and longstanding relationship with Franch as well as for Franch's assistance in securing the loan for his new home. But another motivation was Debtor's wish to avoid any personal deficiency judgment being entered against Patricia in the foreclosure action.

30. As consideration for Debtor agreeing to pay that $19,000 debt that had been discharged as to him, FSNB agreed to dismiss the foreclosure action and significantly reduce the interest rate on the $19,000 debt (from 11% to 8.01%) and add this pre-bankruptcy debt to the new loan balance. The Bank also amended the term of the $94,000

---

1. As discussed below, in 1994, FSNB filed a motion to dismiss its mortgage foreclosure action. Such motion was granted on June 23, 1994.

loan, extending the maturity date from May 5, 1998 to February 16, 2001.

31. After adjustment, the new loan principal became $113,288.51 ("$113,000 loan"). This new amount reflected the addition of the balance due on the old $19,000 loan (which was $21,328 including principal and interest), plus attorney's fees of $900 for the Bank's previous efforts to collect on the loan.

32. Debtor called FSNB on a number of occasions to inquire as to the status of the new loan documentation. He spoke to Vice President of FSNB Jeweline Davis on several of these occasions, who told him when the documents were ready to be signed.

33. Debtor testified that he never signed any loan documentation for the $113,000 loan. Rather, he testified that when he initially signed the loan documentation for the $94,000 loan, all of the loan information was blank. He testified that the Bank must have added the $113,000 and other information without his knowledge. Debtor's testimony in this regard was not credible and was credibly contradicted by other evidence offered by the Bank.

34. The loan documentation for both the original $94,000 loan and the increased $113,288.51 note was computer generated. Once generated, as with all loan documentation produced by computers at FSNB, the only items left blank are the signature lines. In addition, all of those loan forms have date specific copyright information located at the bottom of the form. The 1994 form which was used for the $113,000 loan could not have been generated in 1993 when the Smiths entered into the $94,000 loan.

35. Davis credibly testified that Debtor telephoned her prior to execution of the $113,000 note papers to ask when the new loan documentation would be ready for his signature.

36. Smith signed the documents for the increased loan amount in Davis's presence with full knowledge that the loan principal was to be increased to $113,000.

37. After signing, Debtor told Davis that he would take the documents home for Patricia and Tammy to sign. He returned to the bank three or four days later with the documents completely signed. The loan documentation included Letters of Direction to the Trustee from all three beneficiaries of the land trust authorizing the new loan and execution of a note payable that was signed by FSNB as trustee but not by any of the beneficiaries, and various other documents.

38. Debtor admits that his signature appears on the loan documents, but Patricia and Tammy each denied at trial that their signatures appear on the loan documentation. Although no handwriting expert testified at trial, the signatures of Tammy and Patricia on the $113,000 loan documents do not appear to be their signatures when compared to acknowledged exemplars; rather they may have been signed by Debtor.

39. The loan balance was increased to the $113,000 level on or about May 18, 1994.

40. Also on May 18, 1994, FSNB executed the signed documentation for the new loan and recorded the mortgage shortly thereafter. In addition, FSNB canceled and released the $94,000 mortgage loan on the Berkeley home.

41. FSNB's foreclosure action on the old home was subsequently dismissed on June 23, 1994, with the result that it took no deficiency judgment against Mrs. Smith.

42. In approximately November 1995, the Smiths received an audit letter from the bank showing the increase loan balance. Although Debtor testified that this was the first time he was made aware of the increase, the evidence and testimony at trial demonstrated otherwise.

43. However, Patricia credibly testified that she had no knowledge of the increase until the November audit letter. This letter from the auditors was not offered as an exhibit. Patricia further testified that at that time she alerted her husband to the increased amount. Debtor reviewed the monthly bank statements and he went to FSNB to discuss the loan. The monthly bank statements were not offered as exhibits.

44. The Smiths testified that the loan principal temporarily returned to approximately $94,000 but then subsequently increased. Patricia was unaware that the loan

had increased again until the Smiths attempted to refinance their loan and were informed that the loan balance was $113,000.

45. Norma Fabela testified that on or about August 15, 1996, she had a conversation with Debtor in her office concerning the increased loan amount. Smith told Fabela that he knew he had no obligation to repay the $19,000 but he allowed it to be added to the $94,000 loan because of his relationship with Franch. Fabela testified that at that time, Debtor seemed less concerned with the increase in the loan amount than with $900 in attorneys' fees which were also added to the loan.

46. FSNB supplied Debtor with copies of the loan documentation indicating that the loan balance as of January 1, 1996, was $112,844.67.

47. The Smiths continue to make mortgage payments to FSNB. Although all parties testified that the payment amount under the re-documented loan and the original loan for the Berkeley home are the same, the disclosure statements and promissory notes admitted into evidence indicate that the monthly payments for the $94,000 loan were $790.90 while the monthly payments for the $113,000 loan were $874.78.

48. The parties never complied with the provisions under 11 U.S.C. § 524 for reaffirmation of debt following Debtor's bankruptcy filing.

49. Statements of fact contained in the Conclusions of Law will stand as additional Findings of Fact, and any conclusions of law contained in the Findings of Fact will stand as additional Conclusions of Law.

### CONCLUSIONS OF LAW

#### Jurisdiction

■ Bankruptcy court jurisdiction extends to all civil proceedings arising under Title 11, or arising in or related to cases under Title 11. 28 U.S.C. § 1334(b). If a proceeding does not arise under Title 11 of the U.S.Code or does not arise in or is not related to a case under Title 11, it is not appropriate for bankruptcy judicial determination. See Zerand–Bernal Group, Inc. v. Cox, 23 F.3d 159, 162 (7th Cir.1994). "The phrase 'arising under title 11' describes those proceedings that involve a cause of action created or determined by a statutory provision of title 11." In re Markos Gurnee Partnership, 182 B.R. 211, 220 (Bankr.N.D.Ill. 1995), aff'd sub nom, State of Ill., Dept. of Revenue v. Schechter, 195 B.R. 380 (N.D.Ill. 1996); see also In re Spaulding & Co., 131 B.R. 84, 88 (N.D.Ill.1990) (citing Matter of Wood, 825 F.2d 90, 96 (5th Cir.1987)). "Arising in" jurisdiction encompasses administrative matters that arise only in bankruptcy cases, those being matters not based on any right expressly created by Title 11 but without existence outside of bankruptcy. Id. "Related to" jurisdiction describes proceedings which affect the amount of property available for distribution or the allocation of property among creditors. Id. (quoting Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir.1989)). See also In re Cary Metal Products, Inc., 152 B.R. 927, 934 (Bankr.N.D.Ill.), aff'd, 158 B.R. 459 (N.D.Ill. 1993), aff'd sub nom, Zerand–Bernal, 23 F.3d 159 (citations omitted); In re Spaulding & Co., 111 B.R. 689, 692 (Bankr.N.D.Ill.), aff'd, 131 B.R. 84 (N.D.Ill.1990); In re Xonics, Inc., 813 F.2d 127, 133 (7th Cir.1987).

This case involves a potential violation of the discharge injunction under 11 U.S.C. § 524. To that extent, jurisdiction lies here. The phrase "arising under" has a well defined and broad meaning in the jurisdictional context. By a grant of jurisdiction over all proceedings arising under Title 11, the bankruptcy courts are authorized to hear and decide any matter under which a claim is made under a provision of Title 11 against a debtor and issues as to dischargeability of particular debts. Thus, this case presents a core proceeding under 28 U.S.C. § 157(b)(2)(O) and (I).

■ However, bankruptcy courts do not have jurisdiction over disputes between non-debtor parties where the dispute does not involve property of the estate, does not affect administration of the estate, or will not affect payments to creditors under a confirmed plan. See Zerand–Bernal, 23 F.3d at 161–62; Xonics, 813 F.2d 127; In re Kubly, 818 F.2d 643 (7th Cir.1987). It must be noted that

Patricia and Tammy Smith are not parties in this action. Further, the land trustee is not a party.

Debtor, through his Adversary Complaint, seeks an order requiring the bank to roll the principal mortgage balance back to $94,000 as well as an order imposing sanctions. While this Court certainly has the ability to impose sanctions on a party who violates the discharge injunction, the Court lacks jurisdiction to rewrite a mortgage that affects non-debtor parties (here the wife and daughter) when neither the land trust nor any of the trust beneficiaries are before this Court.

### Discussion

As stated, Debtor has alleged that FSNB violated the discharge provisions of the bankruptcy code by inducing him to reaffirm a $19,000 discharged debt without complying with the reaffirmation requirements of 11 U.S.C. § 524. Debtor further argues that he never intended to become liable on the discharged debt; rather he signed blank loan documents and the bank subsequently filled in the numbers without his knowledge. FSNB argues that Debtor was fully aware that he and his family would be liable on the increased loan amount. FSNB further argues that this was not a reaffirmation but that FSNB had offered Debtor sufficient new consideration to make the increased loan amount a new debt.

So the issue is clear: Was the add-on of the $19,000 old debt to the new loan an improper solicitation and a step to collect payment of discharged debt without following requirements of 11 U.S.C. § 524, or was it part of an independent new loan supported by new consideration?

### Reaffirmation

 A discharge in bankruptcy discharges a debtor from most pre-petition debts and operates as an injunction against any act to recover a discharged debt as a personal liability of the debtor. 11 U.S.C. § 524(a). Reaffirmation creates a voluntary exception to the fresh start provisions of the Bankruptcy Code. *Matter of Duke*, 79 F.3d 43, 44 (7th Cir.1996). While the Code allows a debtor to reaffirm, that may be done only

under the specific conditions set forth in 11 U.S.C. § 524(c). *See In re Latanowich*, 207 B.R. 326, 334 (Bankr.D.Mass.1997). "If a reaffirmation agreement fails to comply fully with § 524, it is void and unenforceable." *In re Turner*, 208 B.R. 434, 437 (Bankr.C.D.Ill. 1997).

In order for a reaffirmation agreement to be considered valid, it must fully comply with the statutory requirements of § 524(c) and (d). "These statutory requirements exist to prevent debtors from being coerced into signing reaffirmation agreements and to enable them to be fully aware of the consequences of the agreement." *In re Noble*, 182 B.R. 854, 857 (Bankr.W.D.Wash.1995) (citing *In re Johnson*, 148 B.R. 532, 539 (Bankr. N.D.Ill.1992)).

A reaffirmation agreement is only enforceable against a debtor who is represented by counsel if:

> (1) the agreement was made in advance of the debtor's discharge;

> (2) the agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after the agreement is filed with the court, whichever occurs later;

> (3) the agreement has been filed with the court; [and]

> (4) the debtor has not rescinded the agreement. . . .

11 U.S.C. § 524(c); *see also Noble*, 182 B.R. at 856–57 (citations omitted).

The addition of the $19,000 debt to the $94,000 debt was not done through any valid reaffirmation agreement. Debtor received his discharge on July 14, 1993, and negotiations for the addition of the $19,000 did not begin until Spring of 1994. The loan documentation for the increase loan contained no statement of right to rescission, and it was never filed with the bankruptcy court. Thus, no valid reaffirmation existed.

 FSNB argues that Debtor voluntarily agreed to repay his discharged debt under § 524(f). However, payments pursuant to agreements which do not comply with § 524 are not voluntary. An agreement to

reaffirm a debt which is not filed with the bankruptcy court and fails to comply with statutory requirements under § 524 is void and never becomes effective or enforceable. Thus, any acts to collect upon that debt as a personal liability of a debtor violate the discharge injunction. *Latanowich*, 207 B.R. at 336. As FSNB has continued to collect upon a discharged debt which was added to the new $94,000 loan, mailed statements to Debtor, and processed payments, it was thereby established that FSNB violated the discharge injunction, unless all of this was part of a new loan transaction entirely supported by new consideration.

### New Debt

If FSNB had established that it collected not upon Debtor's discharged debt, but upon a new debt, it would not have violated the discharge injunction.

FSNB argues that Debtor did not reaffirm or attempt to repay his discharged debt, but rather agreed to become liable on his wife's debt. FSNB argues that it gave Debtor adequate consideration for becoming liable on his wife's debt and that as a result a new obligation was created.

Apart from rights of debtors to reaffirm pre-petition dischargeable debt, debtors and creditors are certainly entitled to enter into a new post-petition obligation. However, the obligation must truly be a valid post-petition obligation and not merely a re-working of a discharged debt:

> Thus, a creditor who enters into a post-petition contract or lease which obligates the debtor under similar terms to those which existed under a prebankruptcy agreement, without observing the reaffirmation rules of 11 U.S.C. § 524(c) and (d), may find itself in violation of the permanent postbankruptcy injunction of § 524(a). Under such circumstances, the creditor will have the burden of proving that the agreement represents a new, post-petition obligation.

*In re Knight*, 211 B.R. 747, 750 (Bankr.D.Or. 1997).

Here, FSNB says the $113,000 obligation constituted a new debt because the bank dismissed its foreclosure action and did not pursue a personal deficiency judgment against Patricia. In addition, FSNB reduced the interest rate on the old $19,000 debt by 3%, extended the maturity date on the $94,000 loan by almost three years, and reduced the interest rate on the $94,000 debt by one-half percent. However, as shown in the following discussion, this did not create an entirely new obligation of the Debtor.

Several precedents have held that, where any part of the consideration for a post-petition agreement is based upon a discharged debt, the agreement must comply with § 524(c). *Matter of Arnold*, 206 B.R. 560, 565 (Bankr.N.D.Ala.1997) (finding discharge injunction violated where a husband agreed to repay his discharged debt as well as his spouse's in exchange for forbearance on execution of judgment against spouse); *In re Stevens*, 217 B.R. 757, 760 (Bankr.D.Md. 1998). The reasoning of these opinions was based upon plain language of the Bankruptcy Code which requires a formal reaffirmation agreement for "an agreement between a holder of a claim and the debtor, *the consideration for which, in whole or in part, is based on a debt that is dischargeable....*" 11 U.S.C. § 524(c) (emphasis added). Thus, as Debtor was discharged from the $19,000 debt, that part of the $113,000 post-discharge agreement cannot be valid against Debtor under 11 U.S.C. § 524(c).

It is true that an opinion in *In re Heirholzer*, 170 B.R. 938 (Bankr.N.D.Ohio 1994), found that a post-discharge agreement was not an invalid reaffirmation agreement where consideration offered by the lender came in the form of an agreement not to foreclose on a mortgage. *Heirholzer* followed reasoning in two earlier opinions in determining that an agreement not to foreclose on a mortgage was sufficient consideration for a post-discharge agreement. In one case cited by *Heirholzer*, *In re Button*, 18 B.R. 171 (Bankr.W.D.N.Y.1982), a debtor attempted a post-discharge affirmation of a criminal restitution debt that the bankruptcy court had found non-dischargeable. In the second case, *In re Petersen*, 110 B.R. 946 (Bankr. D.Colo.1990), the debtor executed an addendum to a lease that reinstated a discharged

commercial lease. Both cases are distinguishable. *Button* involved the "reaffirmation" of a non-dischargeable debt which did not require reaffirmation at all to be enforceable, and *Petersen* involved a lease which the debtor elected to adopt post-petition. Moreover, neither *Heirholzer* nor authority cited within it is controlling in this district.

 The better reasoned view is that any post-petition agreement which obligates a debtor on a discharged debt must comply with the relevant Code sections dealing with reaffirmation. Failure to do so will result in the agreement being considered invalid and collection upon that agreement a violation of the discharge injunction. "Under Section 524(c), if the debtor's consideration is based in whole or in part on a discharged debt, then a reaffirmation agreement must be filed with the court." *In re Getzoff*, 180 B.R. 572 (9th Cir. BAP 1995) (affirming Bankruptcy Court decision that post-petition guaranty is invalid under § 524 because it was based on discharged debt). Moreover, to permit such post-discharge agreements "would be tantamount to holding that the required statutory procedures are unnecessary if a creditor can obtain a debtor's signature on any post-discharge agreement". *In re Kendrick*, 75 B.R. 451, 455 (Bankr.N.D.Ga.1987).

FSNB argues that Debtor did not obligate himself on his discharged debt, but rather obligated himself on his wife's debt. However, there is no real distinction between the $19,000 debt that Patricia owed FSNB and the $19,000 debt to FSNB from which Debtor was discharged. Their obligations were based on the same debt. Moreover, Patricia had no ability or income sufficient to repay the debt herself, and collection efforts or threats against her would be indirect pressures to collect from Debtor.

 FSNB also argues that it entered into the $113,000 loan with Debtor in good faith, canceled the $94,000 mortgage, and dismissed their foreclosure action, thus preventing a deficiency judgment against Mrs. Smith in that case. However, intent or even good faith is not a factor in considering whether a creditor violated the discharge injunction. *In re Hill*, 222 B.R. 119, 122 (Bankr.N.D.Ohio 1998). Regardless of whether Debtor knowingly entered into the post-discharge agreement and regardless of how Patricia and Tammy's signatures appeared on the $113,000 loan documentation, FSNB has violated the discharge provisions of the Bankruptcy Code when it added the discharged debt to Debtor's new debt on that loan.

### Liability Under the Land Trust

 Although the actual obligated party on the $113,000 debt is the land trust and not the Smiths, a violation of the discharge injunction has still occurred. The Smiths' interest in the land trust is considered personal property.

The Illinois land trust, a unique creation of Illinois law, is in essence only a form of real property ownership. A land trust is created by the execution and recording of a deed in trust transferring all legal and equitable title to real property to a trustee. The original owner is designated as the beneficiary of the trust and retains an assignable personal property interest in the trust. The deed does not identify the beneficiary nor does it describe the terms of the trust. A second document, the trust agreement, is contemporaneously executed and outlines the right of the beneficiary to retain absolute control over the management, use, and disposition of the property and to receive all proceeds from the property. Unlike the conventional trust in which the trustee is vested with broad powers over the management and disposition of the trust property, the land trustee may act only at the beneficiary's direction. The trust agreement is not recorded and normally is kept secret from the public.

*Redfield v. Continental Cas. Corp.*, 818 F.2d 596, 607 (7th Cir.1987) (internal citations omitted). Generally, the beneficiaries of a land trust also sign a guarantee along with the other trust documents so they can be held personally liable on the loan. *See* Henry W. Kenoe, *Kenoe on Land Trusts*, § 5.33 at 5–129 (Ill. Inst. for CLE, 1989). Although the Smiths did sign a guarantee of the $94,000 mortgage, no such guarantee was signed in connection with the $113,000 loan.

As a result, one might question whether FSNB could have violated the discharge injunction when Debtor is not personally liable on the $113,000 loan, and only the land trust which owns debtor's home is liable. However, the Illinois Supreme Court has held that for all practical purposes the beneficiary of an Illinois land trust is to be treated as the true owner of the trust property:

> In examining a land trust it is apparent that true ownership lies with the beneficiaries though title lies with the trustee. The trustee derives all of his power from the beneficiary and acts solely on the beneficiary's behalf. The beneficiary may withdraw or modify the trustee's authority at any time ... Indeed, there is not a single attribute of ownership, except title, which does not rest in the beneficiary. The rights of creation, modification, management, income and termination all belong to the beneficiary ... In reality the transfer to the trustee is a formality involving a shifting of legal documents. The land trust is, in fact, a fiction which has become entrenched in the law of this State and accepted as a useful instrument in the handling of real estate transactions. Outside of relationships based on legal title, the trustee's title has little significance.

*Id.* (citing *People v. Chicago Title & Trust Co.,* 75 Ill.2d 479, 492–493, 27 Ill.Dec. 476, 389 N.E.2d 540, 545 (1979) (citations omitted) (emphasis in original)). Indeed, the Seventh Circuit has recommended a substance over form approach when it comes to Illinois land trusts:

> Our decision in *In the Matter of Gladstone Glen,* 628 F.2d 1015 (7th Cir.1980) and, more particularly, the bankruptcy court's ruling in *In the Matter of Langley,* 30 B.R. 595 (Bankr.N.D.Ind.1983), established that in applying the "substance over form" doctrine to "Illinois-type" land trusts the beneficiary's equitable interest in the trust made the real property part of the debtor beneficiary's estate. This is true as a matter of federal bankruptcy law regardless of how the state characterizes the actual legal ownership of the property. *Gladstone Glen,* at 1019. (Note that *Gladstone Glen* was decided prior to the Bankruptcy Code's promulgation. However, the court

in *Langley* noted that the analysis in the Seventh Circuit's opinion was equally applicable to § 541 of the Bankruptcy Code, 11 U.S.C. § 541 (1980), governing the scope of the debtor's estate.)

*Matter of Pentell,* 777 F.2d 1281, 1284, n. 2 (7th Cir.1985).

Thus, even though Debtor is not personally liable on the note and the property is owned through a land trust, the attempt to collect a discharged debt against Debtor's property is a violation of the discharge injunction.

### Sanctions/Punitive Damages

■■■■■■ Although the fact the FSNB was acting in good faith does not prevent a finding that it violated the discharge injunction, it does save FSNB from punitive damages. In order to receive an award of punitive damages against a creditor who violates the discharge injunction, the debtor must prove some sort of malevolent intent or bad faith on the part of the creditor. *In re Walker,* 180 B.R. 834, 849 (Bankr.W.D.La.1995); *In re Vazquez,* 221 B.R. 222, 231 (Bankr.N.D.Ill. 1998). No such behavior has been shown. Thus, no punitive damages will be awarded against FSNB which contracted with Debtor in good faith albeit in violation of the Bankruptcy Code.

However, violation of the discharge injunction has been costly to Debtor, who was obliged to employ counsel to pursue this case, and the reasonable and necessary cost of this litigation may be claimed.

### CONCLUSION

FSNB has violated discharge provisions of the Bankruptcy Code and cannot continue to collect the $19,000 discharged debt from Debtor.

However, as previously stated, neither Patricia nor Tammy are parties to this lawsuit, and the Court is without jurisdiction to rewrite the new mortgage or make a determination as to whether or not Tammy and Patricia are obligated under the $113,000 note. Although the evidence was credible that neither Patricia nor Tammy signed the loan documentation for the $113,000 loan,

they are not before this Court as parties, and no findings or ruling can be made here that affects their rights or obligations.

Judgment to be entered will require FSNB to eliminate Debtor's liability on the discharged part of the debt, without changing the liabilities of Debtor's wife and daughter.

For reasons stated above and pursuant to order to be entered, judgment will separately be entered for Plaintiff Solomon Smith, and is set for presentation by Plaintiff's counsel of proposed judgment order which will provide *inter alia* that Debtor will recover fees to be assessed by the Court following further pre-judgment hearing.