**In re Francis ZARRO, Debtor.**

**No. 94 B 44013(SMB).**

United States Bankruptcy Court,
S.D. New York.

May 7, 2001.

Herzfeld & Rubin, P.C. (Herbert Rubin, David Cohen, Charles A. Crum, Of Counsel), New York City, for Francis Zarro.

Oxman Tulis Kirkpatrick Whyatt & Geiger (Andrew D. Brodnick, Of Counsel), White Plains, NY, for Ronald Scheckter.

## MEMORANDUM DECISION GRANTING DECLARATORY AND INJUNCTIVE RELIEF TO THE DEBTOR

STUART M. BERNSTEIN, Chief Judge.

The debtor, Francis Zarro, commenced this proceeding to prevent Ronald Scheckter from enforcing a state court judgment, and to recover payments made in partial satisfaction of the underlying debt. In the main, the dispute turns on whether Scheckter is seeking to collect a discharged, pre-petition debt or a valid post-petition debt unaffected by Zarro's discharge. The Court conducted an evidentiary hearing on March 28, 2001, at which it heard two witnesses testify and received several documents in evidence.

The Court concludes that the state court judgment is void, and the reaffirmation agreement underlying the judgment is unenforceable. Accordingly, Scheckter is enjoined from taking any further steps to enforce it, and must undo the collection efforts he has thus far taken. The record will be reopened to take additional evi-

dence and receive briefing on Zarro's affirmative claim for monetary relief.

## BACKGROUND

### A. The Zarro Bankruptcy

When Zarro filed his chapter 7 petition on August 24, 1994, he was not the average chapter 7 debtor. A lawyer and real estate developer, he owed over $20 million to some very aggressive creditors. One of those creditors was Ronald Scheckter. Scheckter was also involved in the real estate business, had apparently done business with Zarro, and Zarro owed him approximately $3 million.

Scheckter vigorously pursued the collection of his claim during the bankruptcy. According to Zarro, Scheckter and his attorney, Martin Rapaport, Esq., threatened Zarro's life and the life of his children. (Transcript of Order to Show Cause hearing held March 28, 2001 ("Tr.") at 18–19, 41, 51–52.) Scheckter, along with Raymond Mallozzi and Anne Baker, also filed proceedings to determine the dischargeability of their debts and to object to his general discharge.[1]

In addition, on March 15, 1996, Zarro and Scheckter entered into a reaffirmation agreement, and Zarro signed a note and a confession of judgment. (*Declaration of Francis A. Zarro, Jr. in Support of Motion for a Declaration That a Debt Has Been Discharged and for Related Relief,* dated Mar. 21, 2001, Ex. A.) Zarro defaulted almost immediately, and after Scheckter began efforts to file and enforce the confessed judgment, Zarro sued to stop him. The reaffirmation agreement had not been filed with the Court, as required by 11 U.S.C. § 524(c), and was unenforcea-ble. As a result, Zarro's efforts culminated in an order from this Court, dated October 31, 1996, declaring the judgment void. (*Id.,* Ex. B.)

Undaunted, Scheckter tried another tack. He acquired Mallozzi's claim.[2] This gave Scheckter significant leverage over Zarro. Scheckter's own objection to discharge had been dismissed for procedural reasons, and the acquisition of the Mallozzi claim enabled Scheckter to prosecute Mallozzi's discharge objection.

### B. The Settlement With Scheckter

During the fall of 1997, Zarro was engaged, through two family-owned corporations, in the ownership and renovation of the Island Green Country Club in upstate New York.[3] For reasons that are not clear, Scheckter began to do some consulting work at the course. Initially sporadic, his level of participation eventually increased, and Scheckter spent most of 1998 living at the site and overseeing construction. Although the two differ on the precise terms of their deal, it is undisputed that Zarro respected Scheckter's expertise in real estate matters and welcomed his advice and participation. In addition to providing room and board, Zarro allowed Scheckter to use the club house and golf facilities, made a car available, and ultimately, paid him between $22,000.00 and $25,000.00. (*See* Tr. 16–17, 18, 38–40, 80, 82, 90.)

Around the time that Scheckter started working with Zarro, the two focused increased efforts on resolving their differences. Zarro testified that Scheckter continued to threaten him and his family, (Tr. 51), although oddly, he also said that their

---

1. The chapter 7 trustee also filed an objection to discharge which was eventually settled.

2. According to the claims register, Mallozzi filed a claim in the sum of $138,746.13.

3. New Deal Projects LLC owned the club, and American Past Time LLC operated it. Zarro's wife owned New Deal, and owned the majority of American Past Time.

discussions never became acrimonious. (Tr. 19–20.) In addition, Scheckter told Zarro that he would not settle the Mallozzi claim (and hence, he would continue to prosecute the discharge objection) unless Zarro also settled with him. (Tr. 26.)

These discussions culminated in an agreement dated January 13, 1998 (the "Agreement")(Zarro Trial Ex. ("ZX") A.) The significant financial terms included the following:

1. Zarro executed a $4.5 million note (ZX B), which called for the payment of $100,000.00 on signing, and the balance over time. Part of the payments was dedicated to the settlement or satisfaction of a particular litigation involving Scheckter but not Zarro. If it cost Scheckter more than the dedicated amount to resolve the matter, Zarro would have to pay more.

2. Zarro paid $165,000.00 in consideration of the assignment of the Mallozzi claim.[4]

3. Scheckter assigned two claims in litigation to Zarro. Zarro agreed to diligently prosecute the actions, and pay any net recoveries to Scheckter in partial satisfaction of the note.

The two assigned claims had questionable value. The first claim (the "Schulman" claim) involved an action to collect on a $150,000.00 check that had bounced in June 1993. (ZX G.) Scheckter commenced his action in June 1994. (*Id.*) He testified that he recovered a judgment, (Tr. 81), but had obviously not collected it as of January 1998. The second claim (the "Colli" claim) is more complicated, and is described in a Summary Order issued by the Second Circuit Court of Appeals. (ZX I.) In substance, Scheckter invested in real estate, making a $20,000.00 down payment, and also allegedly infusing as much as $500,000.00 into the property. In August, 1997, the Court of Appeals affirmed the district court order awarding Scheckter a $20,000.00 judgment against third parties. In addition, the Court of Appeals remanded for further proceedings in connection with Scheckter's claim to recover the difference between what he put into and received from the property. The Court identified significant problems with Scheckter's claim. Any recovery net of legal fees appears to be problematic.[5]

Why then, did Zarro pay Scheckter $100,000.00 and promise to pay him another $4.4 million? To be sure, Scheckter's threats and his ability, through the Mallozzi claim, to continue to prosecute the objection to discharge, provided motivation. Zarro also testified that he felt a moral obligation to pay Scheckter, (Tr. 35), but I find that testimony incredible. Instead, Zarro wanted two things from Scheckter immediately. To get them, he was willing to pay a substantial amount up front, and to promise to pay even more in the future although whether he intended to honor that future promise is open to question.

First, Zarro wanted Scheckter to publicly endorse him as an honorable person. Zarro was getting back on his feet and was working on several deals that he hoped would bring in many millions of dollars. (Tr. 84–85.) The publicity from his bank-

---

4. At the same time, the Mallozzi adversary proceedings were dismissed. (ZXs F–1, F–4.) Zarro represented that he paid Mallozzi $165,000.00 to settle the § 523 dischargeability proceeding. (ZX F–1 (Affidavit of Francis A. Zarro, Jr., sworn to Jan. 19, 1998, at ¶ 3)), which was not true. He paid Scheckter.

5. Zarro valued the Colli claim at between $185,000.00 and $200,000.00. (Tr. 92, 93–94.) He never pursued the claim because he lacked the money. (Tr. 94.) Scheckter valued the claim at $2 million. (Tr. 84.) This estimate is not supported by the record.

ruptcy and the allegations made by Scheckter during the proceedings had hurt his reputation. (Tr. 34–35, 67–70.) He needed to restore his business and financial credibility, (Tr. 85), and looked to Scheckter.

Accordingly, as part of the January 1998 settlement, Scheckter executed and delivered a letter (ZX C)(the "Good Guy Letter") addressed to David Sall, Esq., Zarro's attorney, which stated:

> This is to advise you … that notwithstanding that Frank [Zarro] had no legal obligation to do so, that Frank and I have satisfactorily and amicably settled my claim against him.
>
> I must take this opportunity to compliment Mr. Zarro on meeting and fulfilling his obligations, in that Mr. Zarro's obligation to satisfy my claim was solely a moral obligation, and not legally enforceable.

Although Zarro insisted that the Good Guy Letter played no role in his willingness to pay the debt, (Tr. 67), Scheckter testified more credibly on this score. Zarro needed to restore his reputation, and refused to sign the note without the letter. (Tr. 85.) The letter was executed and placed in escrow pending the execution of the Agreement and the accompanying note. (Tr. 85–85.) After the Good Guy Letter was delivered as part of the settlement, Zarro included it in his "information bank," making it publically available as needed. (*See* Tr. 34.)

Second, Zarro was intent on tapping into Scheckter's real estate expertise and services at Island Green. As mentioned, around the time of the Agreement, Scheckter had taken on what amounted to a full time job at Island Green. The Agreement and the note payments, however, were not the consideration for those services. Ac-

cording to Scheckter, Zarro had agreed to pay him $250,000.00 per year to run all of the construction, and the project was expected to last five years. (Tr. 89.) This represented a $1.25 million deal for Scheckter. Zarro advanced $5,000.00 per week initially, but the payments petered out, and eventually stopped after approximately $22,000.00 to $25,000.00 was paid. (Tr. 89–90.) On or about December 15, 1998, Scheckter submitted an invoice for services rendered to American Past Time in the amount of $158,000.00. (ZX K.)

## C. Zarro's Default and its Aftermath

Zarro immediately defaulted on the note. During 1998, he attempted at various stages to placate Scheckter. In August 1998, he promised to assign his right to $3 million in proceeds from the anticipated closing of the El Rancho transaction in Las Vegas. (Tr. 42.) He failed, however, to follow through, and on or about December 7, 1998, Scheckter's attorney, Mark Tulis, Esq. sent Zarro a default notice. (Creditor's Exhibit ("CX") 3.) Tulis told Zarro that unless he received the El Rancho assignment by 5:00 p.m., Scheckter would sue. (*Id.*)[6]

Zarro continued to promise payment, and on February 4, 1999, wrote to Tulis that he would be sending $250,000.00 by the end of the month. (CX 4.) He didn't, and on or about March 11, 1999, Scheckter commenced an action, moving for summary judgment on the note in lieu of complaint. (ZX J.) *See* N.Y.C.P.L.R. 3213 (McKinney's 1992). The parties continued to talk, as evidenced by Sall's June 1, 1999, letter to Tulis. (CX 5.) Sall asked for a six month moratorium on the litigation. In exchange, Zarro promised to pay $100,000.00 in two $50,000.00 installments in June. Sall also wanted another Good

---

**6.** The default notice coincides with Scheck- ter's invoice, sent eight days later.

Guy Letter. On June 18, 1999, Tulis responded by fax indicating an impasse over the good faith language that Sall had requested. (CX 6.) He could not reach Scheckter, and promised a final answer by June 21st. Zarro directed Sall to pay $50,000.00 to Scheckter anyway. (Tr. 56.)

The state court entered a judgment against Zarro in the sum of $4,540,485.00 on February 8, 2000. (ZX D.) The judgment did not reflect credit for the $150,000.00 Zarro claimed he paid. Thirteen months later, Scheckter moved by order to show cause in state court to compel payment of the judgment and to appoint a receiver for Zarro. The order to show cause restrained Zarro, his wife and American Past Times from transferring any sums except to pay current and necessary household or business expenses. (ZX E.)

Up to this point, Zarro had not done anything to challenge the validity of Scheckter's judgment or the underlying debt. He testified that he thought the Agreement and note were valid, (Tr. 45–47), and only learned that the note might be unenforceable during 2000. (Tr. 61.) In truth, he was unconcerned about the enforceability of the note or even the judgment until Scheckter tried to enforce payment. He ran to this Court to invalidate the debt only after Scheckter restrained his wife and American Past Time, interfering with his home and his business. (Tr. 64.)

Thus, nine days after the state court signed the restraining order, Zarro brought on the pending application by order to show cause. He seeks (1) to declare the judgment debt discharged, (2) to declare the judgment void, (3) to compel Scheckter to discontinue the state court proceedings with prejudice, (4) to require Scheckter to return $150,000.00 paid voluntarily in connection with the discharged debt, and (5) to sanction Scheckter for attempting to enforce the debt.

## DISCUSSION

### A. The Validity of the Agreement and Note

Section 524(a) of the Bankruptcy Code voids any judgment of personal liability based on a discharged debt, regardless of when that judgment is issued, and enjoins actions to collect a discharged debt as a personal liability of the debtor. Section 524(c) allows the debtor to waive these protections on a debt-by-debt basis, but an "agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on debt that is dischargeable in a case under this title is enforceable ... only if" it satisfies the requirements set out in § 524(c). The primary purpose of § 524 is to promote the debtor's financial "fresh start." *See Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992); *In re Adams*, 229 B.R. 312, 315 (Bankr.S.D.N.Y.1999).

It is undisputed that the Agreement did not satisfy the procedural requirements of § 524. For example, it lacked a "clear and conspicuous" statement that it was not required by bankruptcy law and could be rescinded, *see* 11 U.S.C. § 524(c)(2), and it was never filed with the Court. *See* id., § 524(c)(3). Scheckter nevertheless contends that the Agreement is enforceable because he gave new and valuable consideration to Zarro in exchange for his promise to pay, and moreover, that Zarro should be estopped from challenging the validity of the Agreement and note. Both arguments lack merit.

Section 524(c) is not concerned with the consideration that the debtor received; instead, it invalidates non-complying agreements where any part of the consideration *given by the debtor* involves his promise to pay a discharged debt. *In re Getzoff*, 180 B.R. 572, 575 (9th Cir. BAP 1995) ("Sec-

tion 524 references the consideration given by the debtor, not the lender"); *Liptz & Roberts, Chartered Pension Plan Trust, et al. v. Stevens (In re Stevens)*, 217 B.R. 757, 760–61 (Bankr.D.Md.1998)(§ 524(c) "places little emphasis on whether the new consideration is sufficient, rather the thrust of the issue is whether any part of the consideration is based on a debt that is otherwise dischargeable"); *In re Gardner*, 57 B.R. 609, 610–11 (Bankr.D.Me.1986) (agreement invalid under § 524(c), even though debtor received some post-filing consideration, where "at least part of the consideration for the agreement is based upon the dischargeable debt"); *see Smith v. First Suburban Nat'l Bank (In re Smith)*, 224 B.R. 388, 396 (Bankr.N.D.Ill.1998). Logic as well as language support this view. Every reaffirmation agreement involves some element of new consideration. Otherwise, the debtor would not agree to pay the discharged debt. If new consideration saved a non-complying reaffirmation agreement, little would remain of the protection afforded by § 524(c).

Here, the Agreement and the note represented Zarro's promise to pay Scheckter's pre-petition claim, the same claim that had been discharged in his bankruptcy. The Agreement recited that "Scheckter may have certain discharged[7] claims against Zarro in excess of $4,000,000.00," Scheckter wanted to assign any and all claims he may have had against Zarro and the parties wished to exchange general releases settling any claims between them. In addition, Scheckter acknowledged in the "Good Guy Letter" that Zarro had no legal obligation to pay his claim, and that "Mr. Zarro's obligation to satisfy my claim was solely a moral obligation, and not legally enforceable." The amount that Zarro agreed to pay—$4.5 million—did not coincidently "[bear] some resemblance to the pre-petition debt," (*Post–Hearing Brief in Opposition to the Debtor's Order to Show Cause*, dated Apr. 9, 2001 ("*Scheckter Brief*"), at 18); it *was* the pre-petition debt.

Nonetheless emphasizing the consideration that he gave, Scheckter cites several decisions that enforced non-complying reaffirmation agreements based on the debtor's receipt of new consideration. *See, e.g., In re Watson*, 192 B.R. 739 (9th Cir. BAP 1996), *aff'd*, 116 F.3d 488 (9th Cir. 1997) (unpublished table mem.); *Minster State Bank v. Heirholzer (In re Heirholzer)*, 170 B.R. 938 (Bankr.N.D.Ohio 1994); *In re Petersen*, 110 B.R. 946 (Bankr. D.Colo.1990); *Button v. Sheridan Oil Co.*, 18 B.R. 171 (Bankr.W.D.N.Y.1982). These decisions, however, are distinguishable as they did not involve the reaffirmation of personal debts discharged in the bankruptcy. Instead, they concerned post-petition promises to pay non-dischargeable debts, *see In re Button*, 18 B.R. at 172 (note given in satisfaction of non-dischargeable criminal restitution claim)[8], *in rem* obligations that passed through the bankruptcy, *see In re Watson*, 192 B.R. at 748 (promise to pay secured creditor who was seeking to foreclose on its collateral after the stay was terminated); *In re Heirholzer*, 170 B.R. at 941 (same), or prospective debts that would arise from the use of the creditor's property in the future. *In re Petersen*, 110 B.R. at 950 (agreement to

---

7. The word "discharge" did not appear in the draft, and was written in by hand and initialed by the parties.

8. Scheckter's discussion of *Button* in his post-hearing brief omits a material fact. As noted, the debtor's note was delivered in satisfaction of the non-dischargeable restitution claim, and not in satisfaction of the discharged debt as his brief implies. (*See Scheckter Brief* 14.) Consequently, the case is not "on the '*Button*'," (*id.* at 14 n. 10), but rather, Scheckter has pushed the wrong button.

continue real property lease rejected by Trustee and not in default).

Here, Scheckter failed to connect Zarro's $4.5 million promise with a similar claim. Instead, the Zarro's promise was rooted in his discharged, pre-petition obligation, and that is what he agreed to pay. To the extent that Scheckter's authorities suggest that a post-petition agreement to pay a discharged debt is valid simply because the creditor offers something extra, I join the growing chorus that questions their correctness. *See In re Smith,* 224 B.R. at 396–97 (distinguishing *Heirholzer, Button* and *Petersen,* but adding that they are not controlling); *In re Stevens,* 217 B.R. at 761 (*Heirholzer* takes an approach to § 524(c) that is contrary to what Congress intended); *In re Arnold,* 206 B.R. 560, 566 (Bankr.N.D.Ala.1997) (*Heirholzer* and *Button* are wrong).

■ Finally, Zarro is not estopped from challenging the validity of the Agreement or the note. Under New York law, a party invoking equitable estoppel must show (1) a misrepresentation or concealment of fact, (2) the knowledge or expectation that the innocent party will rely on the misrepresentation or concealment, (3) actual or constructive knowledge of the true facts by the wrongdoer, and (4) detrimental reliance. *General Elec. Capital Corp. v. Armadora,* 37 F.3d 41, 45 (2d Cir.1994). The misrepresentation must be one of fact, and an opinion or misrepresentation of law will not suffice. *Lignos v. United States,* 439 F.2d 1365, 1368 (2d Cir.1971); *In re Chateaugay Corp.,* 156 B.R. 391, 403 n. 16 (S.D.N.Y.), *aff'd,* 10 F.3d 944 (2d Cir.1993); 57 N.Y.Jur.2d, *Estoppel, Ratification & Waiver* § 13, at 24 (2000). Further, the innocent party's reliance must be reasonable. *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995); *Petrelli v. City of Mount Vernon,* 9 F.3d 250, 256 (2d Cir.1993).

■ Scheckter seems to argue that Zarro should be estopped from relying on the "amount" of the note to invalidate it because (1) the note would be enforceable if Zarro had agreed to pay $1 million instead of $4.5 million, and (2) invalidating the note would permit Zarro to get the consideration that he wanted from Scheckter without paying for it. (*See Scheckter Brief* 18.) His argument neglects to identify any misrepresentation that would support a claim of equitable estoppel. The "amount" of the note is simply evidence that it was given in satisfaction of the pre-petition debt in the same amount. In this regard, a $1 million note would be equally invalid if the consideration involved the payment of the discharged debt. In other words, the amount of the post-petition agreement does not have to match the amount of the pre-petition debt to be unenforceable.

■ Finally, invalidating the debt may leave Scheckter holding the short end of the stick, but it does not change the result. Section 524 voids Scheckter's judgment, enjoins his collection efforts and renders the Agreement and note unenforceable. The statute is absolute, unequivocal, and without qualification or condition. It does not require Zarro to restore Scheckter to the *status quo* to invoke the discharge injunction defensively, which is essentially what he is doing in an effort to stop collection. This is not to say that Scheckter is barred from recovering his consideration, or its reasonable value. The parties have not, however, addressed this issue, and it will have to be decided at another time.

Based on the foregoing, I conclude that the Agreement and the note violate § 524(c), and are invalid and unenforceable. In addition, the state court judgment is void under § 524(a), and Scheckter must take steps to remove the judgment of record and terminate efforts to collect it.

## B. The Return of the $150,000.00 Paid to Scheckter

The final piece of relief sought in the order to show cause concerned the return of the $150,000.00 allegedly paid by Zarro to Scheckter under the Agreement and note. This portion of Zarro's application raised far more difficult legal and factual issues, and the parties neglected these issues at the hearing and in their post-hearing memoranda. The issues include the legal basis for recovery, whether the payments were voluntary within the meaning of § 524(f), whether Zarro or a third party made the payments, and if a third party made them, can they be recovered by Zarro, and whether Zarro must restore Scheckter to the *status quo ante* as a condition to recovery. There may be others, and I do not mean to foreclose any issues on this point at this juncture.

Accordingly, the Court will reopen the record for the limited purpose of conducting further proceedings with regard to Zarro's claim for affirmative relief. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (a motion to reopen to submit additional proof is addressed to the sound discretion of the court); *Magnaleasing, Inc. v. Staten Island Mall*, 428 F.Supp. 1039, 1045 (S.D.N.Y.) (the trial judge, in his sound discretion, may reopen a case *sua sponte*, to clarify the evidence and focus it into a meaningful fact pattern), *aff'd*, 563 F.2d 567 (2d Cir.1977). The parties are directed to contact chambers to schedule a conference at which the scope of the further proceedings can be explored. The foregoing constitutes the Court's findings of fact and conclusions of law. Settle order on notice.